**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 13-cv-02888-MSK-MEH

**DANVIS S. SMITH,**

     **Plaintiff,**

**v.**

**AETNA LIFE INSURANCE COMPANY,**

     **Defendant.**

_____

**OPINION AND ORDER DENYING MOTION FOR RECONSIDERATION AND
GRANTING MOTION FOR RULING BASED ON ADMINISTRATIVE RECORD**
_____

**THIS MATTER** comes before the Court pursuant Defendant Aetna Life Insurance

Company's ("Aetna") Motion for Ruling Based on Administrative Record (**# 69**); and Mr.

Smith's Motion for Reconsideration (**# 72**) of the Court's June 24, 2014 Opinion and Order (**# 8**)

denying Mr. Smith's Motion to Remand, Aetna's response (**# 73**), and Mr. Smith's reply (**# 75**).

## FACTS

Mr. Smith is the insured on a long-term disability insurance policy issued by Aetna

through Mr. Smith's employer.  Mr. Smith suffered an injury to his arm and shoulder during an

altercation with a police officer in April 2008.  That injury, and other medical conditions

experienced by Mr. Smith, prevented him from returning to his job as an Account Manager.  He

applied for and received benefits under the Aetna policy until April 2010, at which time Aetna

concluded that he no longer met the policy's eligibility criteria.

Meanwhile, Mr. Smith filed a lawsuit against the police officer involved in the 2008

incident.  Aetna claimed a lien on the proceeds of that lawsuit.  Mr. Smith eventually settled the

suit for $ 157,000, and Aetna declared that half of that sum reflected compensation for lost wages due to disabilities caused by the incident, for which Aetna was entitled to repayment. Aetna ultimately calculated that the funds received from the settlement more than fully offset the benefits it had paid Mr. Smith, entitling Aetna to demand that Mr. Smith repay the excess benefit payments in the amount of approximately $ 18,000.

Mr. Smith commenced this action against Aetna in the Colorado District Court for Denver County.  That action alleged various state law claims against Aetna, sounding in breach of contract and statutory unfair trade practices, among others.

Contending that Mr. Smith's claims were preempted by ERISA, 29 U.S.C. § 1001 *et seq.*, Aetna removed (**# 1**) the action to this Court.  Aetna moved to dismiss (**# 9**) Mr. Smith's state-law claims as preempted by ERISA, and Mr. Smith filed a Motion to Remand (**# 26**).  On June 24, 2014, the Court granted Aetna's motion, dismissing all of Mr. Smith's state-law claims as preempted and treating the proceeding as one to recover benefits owed under an ERISA plan pursuant to 29 U.S.C.  § 1132(a)(1)(B).  The Court denied Mr. Smith's motion.  Mr. Smith now moves for reconsideration (**# 72**) of that Order, primarily arguing that the insurance policy in question is not an employer benefit plan covered by ERISA.

Separately, the Magistrate Judge issued a Scheduling Order (**# 38**), requiring Mr. Smith to file his opening brief on the merits by March 24, 2014; for Aetna to file its response by April 24, 2014; and for Mr. Smith to file a reply brief by May 8, 2014.  Mr. Smith neither filed an opening brief nor sought an extension of time to do so.  On April 24, 2014, Aetna filed its "response" brief, noting Mr. Smith's failure to file an opening brief and setting forth Aetna's

position on the merits of Mr. Smith's contentions as alleged in the Complaint.  Mr. Smith did not

file a reply brief as to the merits of his claim.[1]

## ANALYSIS

Mr. Smith has appeared *pro se* throughout this action.  Accordingly, the Court reads his

pleadings liberally.  *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).  However, such liberal

construction is intended merely to overlook technical formatting errors and other defects in his

use of legal terminology and proper English.  *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.

1991).  *Pro se* status does not relieve Mr. Smith of the duty to comply with the various rules and

procedures governing litigants and counsel or the requirements of the substantive law, and in

these regards, the Court will treat him according to the same standard as counsel licensed to

practice law before the bar of this Court.  *See McNeil v. U.S.*, 508 U.S. 106, 113 (1993); *Ogden*

*v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

### A.  Motion for Reconsideration

Mr. Smith seeks reconsideration of the Court's June 24, 2014 Order that denied his

motion to remand the action and granted Aetna's motion to dismiss Mr. Smith's state-law claims.

The Court treats the motion as one to alter a judgment or order pursuant to Fed. R. Civ. P.

59(e). Such relief is appropriate to address an intervening change in the law, to present newly-

discovered evidence, or to correct manifest injustice, such as when the Court has misconstrued a

party's argument.  *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  It is not,

however, an opportunity for a party to re-assert arguments previously raised and rejected or to

advance arguments that could have been raised earlier.  *Id.*

---

[1]     Mr. Smith's reply brief in support of his Motion for Reconsideration acknowledges Mr.
Smith's recognition that he has not filed his merits brief.  Docket # 75 at 29.  It appears that Mr.
Smith believes that he will first be granted an opportunity "to prepare a revised complaint in line
with ERISA once the issue of jurisdiction is settled in Aetna's favor," and he states that he has
purposefully refused to respond to Aetna's merits briefing in the interm.

Mr. Smith's 22-page motion is extensive in its detail, taking issue with inconsequential details in the Court's Order (*e.g.* the Court's statement that he received benefits for "two years" when, in fact, the period was actually only 21 months; that the Court occasionally refers to the insurance policy in question as a "plan" rather than a "policy"), rehashing a speculative and entirely irrelevant argument concerning service of the Notice of Removal upon him, and complaining that "the subject ruling does not appear to address 17 of the points made by Smith" in his motion to remand (nearly all of which are arguments or reflect an incorrect understanding of the law, *e.g.* "Because Aetna does business in Colorado, it is considered a 'citizen' of Colorado" for diversity jurisdiction purposes, *c.f.* 28 U.S.C. § 1332(c)(1)). These contentions do not warrant particular analysis or explanation.

Construed liberally in Mr. Smith's favor, the motion primarily raises two major arguments: (i) the policy was not issued pursuant to an "employee welfare benefit plain" and is thus not covered by ERISA, and (ii) that ERISA cannot be given preemptive effect over state laws without violating the U.S. Constitution. Both arguments are without merit.

ERISA applies to "employee welfare benefit plans" which it defines as "any plan, fund, or program . . . maintained by an employer . . . for the purpose of providing for its participants . . . through the purchase of insurance . . . benefits in the event of sickness, accident, disability, or death." 29 U.S.C. § 1002(1). Mr. Smith concedes that the Aetna disability insurance policy at issue here was purchased on his behalf by his employer, but argues that he has not alleged and Aetna has not produced any written "plan" and that "the subject insurance policy contains no claim of being an 'employee welfare benefit plan.'" This is incorrect. Attached as Exhibit A to Aetna's Notice of Removal is a copy of the Group Accident and Health Insurance Policy in question. (Mr. Smith does not dispute the authenticity or relevance of this document; indeed, his

Motion for Reconsideration expressly cites to this Exhibit as being "the subject insurance policy." Docket # 72, ¶ 8.) Page 21 of that document is entitled "Additional Information Provided by IAC/InterActiveCorp" (Mr. Smith's employer). It indicates that the "Plan Name" is "IAC/InetrActiveCorp Health and Welfare Plan," and that it is a "Welfare Benefit Plan" sponsored by the employer. It makes clear that the plan is subject to ERISA. Under these circumstances, there can be no meaningful argument by Mr. Smith that the insurance policy he seeks benefits under was issued pursuant to an employee welfare benefit plan covered by ERISA. *See generally LaFayette v. Cobb* 385 F.Supp.2d 1152, 1156 (D.N.M. 2004) (addressing the elements constituting an ERISA "plan"). This is sufficient basis for Aetna's removal and this Court's exercise of federal subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

Mr. Smith's arguments that ERISA cannot preempt state law, or that it does so in violation of the Constitution, have long been rejected by the U.S. Supreme Court. The Court has repeatedly recognized the "expansive pre-emption" provisions of ERISA that operate to eliminate any state-law claim that "duplicates, supplements, or supplants the ERISA civil enforcement remedy." *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208-09 (2004). This includes Mr. Smith's breach of contract claims, *Settles v. Golden Rule Ins. Co.,* 927 F.2d 505, 509 (10th Cir. 1991) ("common law tort and breach of contract claims are preempted by ERISA"), as well as Mr. Smith's claims under the Colorado Consumer Protection Act, *see e.g. Bast v. Prudential Ins. Co. of America*, 150 F.3d 1003, 1008 (9th Cir. 1998). Mr. Smith does not clearly articulate the basis upon which he contends that a finding of ERISA pre-emption of his state-law claims would result in unconstitutionality, but in light of the broad precedent recognizing ERISA's pre-emptive effect, this Court sees no apparent constitutional impediment. *See e.g. Land v. Chicago Truck Divers, Helpers and Warehouse Workers Union*, 25 F.3d 509, 512 (7th Cir. 1994)

(rejecting argument "that ERISA . . . is unconstitutional because it permits private parties to formulate welfare-benefit plans that abrogate principles of state law").

Accordingly, Mr. Smith's motion for reconsideration is denied.

## B. Merits

Mr. Smith's failure to file a brief on the merits of his claim does not prevent this Court from proceeding to adjudicate his claims.  The Scheduling Order clearly advised Mr. Smith of the deadline for filing merits briefs and nothing in the docket indicates that he sought an extension of time, modification of the deadlines, or a stay of the proceedings pending determination of his motion for reconsideration.  As the Court has previously noted, Mr. Smith's *pro se* status does not exempt him from the obligation to follow procedural rules, including deadlines set by the Court for briefing on the merits.  Accordingly, the Court deems Mr. Smith to have waived his opportunity to present further factual and legal arguments on the merits of his claims.  The Court grants Aetna's Motion for Ruling Based Upon Administrative Record **(# 69)** and proceeds to adjudicate Mr. Smith's claims solely in light of the Administrative Record and Aetna's response brief.

Under 29 U.S.C. § 1132(a)(1), a participant in an employee welfare benefit plan may bring suit to recover benefits due to him under the terms of the plan, to enforce his rights under that plan, or to clarify his right to future benefits.  In evaluating such a claim, the Court interprets the policy terms using their ordinary and popular meaning, and as an insured of average intelligence and experience would interpret them. *See Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir.1992).

Generally, a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard, however, if a benefit plan gives the plan administrator discretionary authority

to determine eligibility for benefits or to construe the terms of the plan, the plan administrator's actions are reviewed using an arbitrary and capricious standard. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When examining a case under an arbitrary and capricious standard, the reviewing court upholds an administrator's decision if it is reasonable and made in good faith.  *See Kimber v. Thiokol Corp*., 196 F.3d 1092, 1098 (10th Cir. 1999) (citations omitted).  The reviewing court "need only assure that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end." *Id.*   That is, the decision must only be "sufficiently supported by facts within [the administrator's] knowledge to counter a claim that it was arbitrary or capricious." *See id.* An interpretation of a plan is arbitrary and capricious if it is lacking in substantial evidence or contrary to law. *See Toriz v. Ball Corp*., 862 F.2d 1428,1429 (10th Cir.1988). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support an administrator's decision. *See Caldwell v. Life Ins. Co. of North America,* 287 F.3d 1276, 1282 (10th Cir.2002). In other words, it is more than a scintilla, but less than a preponderance. *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1119–20 (10th Cir.2006).

Where the person or entity making determinations regarding benefit eligibility is also the plan insurer, the Court must recognize the inherent conflict of interest and weigh that conflict as part of its analysis.  *Foster v. PPG Industries, Inc.*, 693 F.3d 1226, 1232 (10th Cir. 2012).

It is not entirely clear whether this is the case here: the policy submitted by Aetna identifies Mr. Smith's employer, not Aetna, as the "Plan Administrator."  However, the Administrative Record makes clear that Aetna, not Mr. Smith's employer, made the eligibility determinations at issue here.   Aetna has argued that the "arbitrary and capricious" standard is applicable here, and Mr. Smith has not submitted any evidence or argument to the contrary.

Accordingly, the Court will assume that Aetna, although perhaps not the nominal Plan Administrator, nevertheless possessed the discretion to make determinations as to a claimant's eligibility, thus triggering the arbitrary and capricious standard. However, in deference to Mr. Smith, the Court will construe the ambiguity in the record in his favor and assume that Aetna, as both a plan administrator and the insurer of the plan, also labored under some degree of conflict of interest. But in the absence of Mr. Smith pointing to particular evidence in the record that suggests that Aetna's conflict of interest was particularly pernicious, the Court finds that conflict to have minimal weight in the arbitrary and capricious analysis. *Id.*

      1. Termination of benefits

The policy in question provides that, for the first 24 months following an injury, an employee is considered disabled and eligible for benefits (following an elimination period) if he: (i) cannot perform the material duties of his own occupation of Account Manager; and (ii) his work earnings meet a certain threshold. An employee's "period of disability" is deemed to end, according to the policy, when: (i) an independent medical exam report fails to confirm the disability; (ii) the employee fails to furnish proof demonstrating the disability is ongoing; or (iii) when Aetna concludes that the employee is no longer disabled.

The record reflects that Aetna received Mr. Smith's 2008 application for benefits and, in October 2008, concluded that Mr. Smith's injuries left him disabled under the terms of the policy. In January 2010, Aetna requested that Mr. Smith provide a periodic update on his medical status from Dr. Heller, the orthopedic surgeon attending to his shoulder injury. On or about March 4, 2010, Aetna spoke to Mr. Smith, who stated that he was no longer seeing Dr. Heller, but instructed Aetna to contact Dr. Compton, his primary care physician, for more information about his condition. Aetna also requested at that time that Mr. Smith complete a

work history questionnaire and provide information about other sources of income.  The record appears to reflect that Mr. Smith completed these documents.

The record reflects that although Mr. Smith saw a number of medical practitioners after his injury, but his care was primarily provided by two individuals: Dr. Koehn, a chiropractor, and Dr. Compton.

Dr. Koehn completed an Attending Physician Statement for Aetna on April 13, 2010. She noted that she had begun seeing Mr. Smith shortly after the September 2008 incident with the police officer, and saw him approximately twice a month thereafter, up to the date of the document.  She diagnosed him as having "segmental dysfunction" in his lumbar spine.  In the section titled "Abilities/Limitations," Dr. Koehn reported that Mr. Smith was able to perform "sedentary work activity."  In response to the question "what medical restrictions/limitations are you placing on patient?," Dr. Koehn responded "no lifting anything [more than] 5 lbs."  (She also reported that there was no "medical contraindication for patient to participate in Vocational Rehabilitation (job training) programs," although she responded to the question "In your opinion, is your patient motivated to return to work" with the answer "no.")

Dr. Compton also completed an Attending Physician Statement on or about April 18, 2010.  She reported that she been treating Mr. Smith for more than two years, initially for a torn rotator cuff.  She also reported diagnoses of sciatica, "BPH" [presumably benign prostatic hyperplasia, or an enlarged prostate], "HTN" [presumably hypertension], and "OA" [presumably osteoarthritis].  (The record also reflects that Mr. Smith suffered from a number of additional maladies, including fibromyalgia, depression, irritable bowel syndrome, and other conditions.) In the section of the form reading "for medical reasons, the patient will need to be absent from work due to a disability beginning _____ and ending on _____," Dr. Compton completed the first

blank with the date "4/8/10" and the second blank with a question mark.  Later in the form, under the "Abilities/Limitations" section, Dr. Compton checked the box that reflected her belief that Mr. Smith is "able to do sedentary work activity," subject to limitations of "sitting for greater than 20 min" and "limited lifting and [standing?]."  Dr. Compton checked boxes stating that Mr. Smith could work two hours per day, three days per week.  She indicated that she prescribed "restrictions on work activities" beginning on March 10, 2008, with those restrictions to remain in effect "TBD."  The form again asked for a "return to work date," which Dr. Compton again completed with a question mark.  Dr. Compton also completed a "Capabilities and Limitations Worksheet."  It reflected her belief that Mr. Smith could "occasionally" (apparently defined as "up to 2.5 hours") perform motions such as grasping, fine manipulation, and repetitive motion with his hands.  The form repeated the conclusion that Mr. Smith could work up to 2 hours per day, and that the duration of restrictions placed on him remained unknown.

Aetna had its own consulting physicians review Mr. Smith's medical records and speak with his providers.  The first review was conducted in or about June 2010 by Dr. Misek, a chiropractor.  Of particular significance in Dr. Misek's report is the "Peer to Peer Consultation" section.  Dr. Misek states that he was able to converse with Dr. Koehn about Mr. Smith.  Of this discussion, Dr. Misek writes that "when asked about his ability to return to work, Dr. Koehn stated that she felt claimant could return to work in a sedentary position."  Dr. Misek concluded that, based on his review, "[work] restrictions imposed on the claimant are without support of any significant objective findings."

Simultaneously, Aetna had a second consulting physician, Dr. Weinstein, an internal medicine specialist, reviewing Mr. Smith's records.  Like Dr. Misek, Dr. Weinstein was ultimately able to speak directly to Dr. Compton about Mr. Smith.  Dr. Weinstein reported that

Dr. Compton stated that Mr. Smith "cannot sit and stand for long periods of time, but also

indicated this was self-report from the claimant."  Dr. Weinstein's report further states that Dr.

Compton "noted that the claimant had presented a 5-page letter of his symptoms, and she was

basing her comments on work restrictions and limitations [in the Attending Physician Statement]

on the claimant's self-report."  Based on her review of Mr. Smith's records and her conversation

with Dr. Compton, Dr. Weinstein concluded:

> Attending Physician Statement from Dr. Compton, dated 4/18/10,
> indicates the claimant was capable of sedentary work activity.  She
> noted he had limitations on sitting for greater than 20 minute[s],
> and he also had limitations on standing.  However, the physician
> acknowledged during the peer-to-peer consultation that these
> restrictions were based on the claimant's self-report.  The records
> have not documented significantly abnormal musculoskeletal or
> neurological examination findings that would support the need for
> specific restrictions and limitations from the claimant's sedentary
> work [other than repetitive overhead reaching with the right arm].

On June 24, 2010, Aetna wrote to Mr. Smith, advising him that it had concluded that the

medical information it had on file failed to support a conclusion that he continued to remain

disabled under the terms of the policy as of March 31, 2010.  Mr. Smith appealed that decision

through Aetna in 2011.  Aetna had a third consulting physician, Dr. McCrary, review Mr.

Smith's records in or about August 2011 in conjunction with Mr. Smith's appeal of the denial of

his benefits.  Dr. McCrary spoke to Dr. Koehn, who reported that she could not opine as to Mr.

Smith's ongoing ability to work as of that time because she had ceased treating him in May

2010.  He also attempted to speak to Dr. Compton, but was unable to do so because Dr. Compton

did not return any of his calls, nor did she respond to a form mailed to her by Aetna.  Dr.

McCrary's review of the record concluded that Mr. Smith was capable of returning to sedentary

work as of April 1, 2010, albeit with restrictions on lifting and reaching and with occasional

changes of position. On August 24, 2011, Aetna denied Mr. Smith's appeal.

Based on this record, the Court cannot say that Aetna's conclusion that, as of approximately April 1, 2010, Mr. Smith was no longer disabled (as that term is defined in the policy) was arbitrary or capricious.  Aetna ascertained the essential nature of Mr. Smith's "own occupation" as an Account Manager (sometimes described in other documents as "Inside Sales" or even "Telephone Solicitation"), concluding it to be a "sedentary" one involving lengthy periods of sitting but minimal lifting.  The record reflects that Mr. Smith completed a Work History and Education Questionnaire that described his primary duties as "telephone outbound to service professionals to sell packages of leads, extensive use of computer throughout day logging each call and conversation."  He estimated that the job called for "continuous" sitting with some standing and walking; he wrote "8 hr. accumulated random [check mark?] to & from work, to breaks, to meetings, to training."  The Court understands this to mean that Mr. Smith's full-time workday involved 8 hours of work, mostly sitting, frequently punctuated by the need to stand and walk to other locations for meetings of various types.

Of Mr. Smith's two treating providers, one, Dr. Koehn, unambiguously reported to Aetna, both in writing and orally, that she believed he was capable of returning to work as of early April 2010.  The only restriction reported by Dr. Koehn was on Mr. Smith's ability to lift and carry items weighing more than 5 pounds, a task that does not appear to be a regular part of his job.  Mr. Smith has not submitted any medical evidence that disputes Dr. Koehn's written representations on her Attending Physician Statement, nor has he disputed Dr. Misek's representation that Dr. Koehn orally confirmed her belief that Mr. Smith could return to work.  Dr. Koehn's conclusion is significant, given both her lengthy treatment relationship with Mr. Smith, as well has her focus on biomechanical issues involving Mr. Smith's back and shoulder conditions.  According to Mr. Smith, the major obstacle to his ability to resume his job is his

alleged loss of fine motor skills in his right hand, making it impossible for him to perform the typing component of his job.  One would reasonably assume that, as a chiropractor, Dr. Koehn would observe and report upon any deficiencies she observed in Mr. Smith's ability to perform fine motor tasks such as typing, as such tasks are intimately connected with the chiropractic treatment she was providing.  The absence of any statement on this point by Dr. Koehn, and her conclusion that Mr. Smith could return to work without significant limitations, is compelling.

Dr. Koehn's belief that Mr. Smith could return to his own occupation as of April 2010 was further corroborated by three consulting physicians hired by Aetna, each of whom similarly concluded that the medical record as a whole did not support a conclusion that he was disabled under the terms of the policy.  Although such consulting physicians were retained by Aetna, and thus, may not necessarily be assumed to be completely impartial, nothing in the record suggests that their reviews were contrary to established medical procedures or were predetermined.  *See e.g. Benson v. Hartford Life & Accident Ins. Co.*, 511 Fed.Appx. 680, 685 (10th Cir. 2013).  In any event, the record reflects that their conclusions were the same as Dr. Koehn's unimpeached opinion, which adds to the credibility of those opinions.

That leaves Dr. Compton's assessment.  Her Attending Physician Statement is ambiguous: on the one hand, it appears to reflect Dr. Compton's belief that Mr. Smith remained unable to work due to disability from at least April 8, 2010 through an unknown date.  On the other hand, the form also reported Dr. Compton's belief that Mr. Smith was capable of resuming sedentary work, at least for a limited number of hours per day and with some restrictions on the frequency of his sitting and standing.  Aetna was able to obtain some clarification on this point through the report of Dr. Weinstein, who was able to speak directly with Dr. Compton.  In that conversation, Dr. Compton apparently reported that the restrictions she placed on Mr. Smith's

ability to work were not necessarily the result of her own independent medical observations, but rather, were mostly derived from Mr. Smith's own self-reported statements of his limitations. (Mr. Smith offers no evidence to refute Dr. Weinstein's version of the conversation.)

This statement from Dr. Compton raises questions regarding the reliability of the contents of her Attending Physician Statement.   Taken at face value, it would seem to suggest that Dr. Compton did not offer any medical opinions of her own, and that she was merely a conduit for Mr. Smith to report his own opinions regarding his limitations.  More charitably, it invites concerns as to whether Dr. Compton's report overstates Mr. Smith's actual limitations.  Under these circumstances, the Court cannot say that it was unreasonable for Aetna to afford lesser weight to those portions of Dr. Compton's report that appear to suggest that Mr. Smith was incapable of returning to work, and to instead turn to the report of someone like Dr. Weinstein who, although arguably aligned with Aetna, offered a thorough review of the pertinent records and explained in detail the reasons for her conclusions.  Most notably, Dr. Weinstein noted nothing in Dr. Compton's records that would reflect "any loss of find manipulation or loss of muscle strength of the upper extremities.  Therefore, there is no documentation that the claimant would be unable to perform sedentary work including typing."

Once again, it is important to emphasize that the Court's review in this matter is somewhat deferential to Aetna.  This Court's task is to ask whether Aetna's decision was "reasonable and made in good faith."  *Phelan v. Wyoming Associated Builders*, 574 F.3d 1250, 1256 (10th Cir. 2009).  The Court need not conclude that Aetna's decision is necessarily the correct one, or the only one the record can support; rather, all that is necessary is that Aetna's decision derive reasonably from the record.  Here, given the clear and repeated statements from Dr. Koehn indicating that Mr. Smith was capable of resuming sedentary work with minor

restrictions as of April 2010, the corroborating conclusions of three consulting physicians, and the ambiguous and qualified opinions expressed by Dr. Compton, the Court cannot say that it was unreasonable for Aetna to discount the latter and rely on the former.  Accordingly, the Court finds that Aetna's conclusion that Mr. Smith was capable of resuming his own occupation as of April 2010, and thus, that he was no longer disabled under the terms of the policy, was not arbitrary or capricious.

Mr. Smith argues (indirectly, in his Complaint and in some of his collateral motion papers) that the Social Security Administration found him to be eligible for disability benefits under that program on September 21, 2010, suggesting that Aetna's conclusions regarding his inability to work were contrary to the Social Security Administration's conclusions and thus, arbitrary.  As explained in *Torrey v. Qwest Communications Intl.*, 838 F.Supp.2d 1201, 1210 (D.Colo. 2012), "SSA disability determinations are not dispositive" of eligibility for disability benefits under a private insurance plan governed by ERISA, but "[n]either can they be ignored." Rather, the weight to be given such a determination will vary from case to case, depending on numerous factors including "the quality of the rest of the administrative record, . . . the quality of evidence presented to the SSA, the reasonableness of the SSA determination, and other factors that might be deemed relevant in a particular case."  *Id.*

Here, the Court is inclined to give little weight to the SSA's determination.  A review of the Social Security Administration's decision reflects that it was based primarily based on a psychological evaluation of Mr. Smith by a Dr. Leidal on December 12, 2008.  According to the decision, Dr. Leidal observed Mr. Smith to have "weaknesses in processing speed which appeared mostly related to use of his right hand and arm, arthritis in his hands and pain in his shoulder that slowed fine motor speed."  Dr. Leidal also observed minor impairments in Mr.

Smiths' persistence in completing routine daily tasks, his pace in task completion, and his "ability to maintain employment, adapt to the work environment, and tolerate the stressors of the work environment."  (Dr. Leidal found Mr. Smith to be unimpaired in numerous other respects.) The Social Security judge rejected a December 11, 2008 evaluation from a Dr. Graesser that reached a different conclusion.  Dr. Graesser found that Mr. Smith suffered from "multiple medical problems," but concluded that he could lift and carry light weights frequently, that he could sit for one hour periods for a total of eight hours in a day, could stand for one hour periods for up to two hours per day, that he could walk several blocks with the assistance of a cane (albeit slowly), that he would have to "get up frequently to use the bathroom," and that he could "continuously handle, feel, and push/pull, frequently reach other than overhead, and finger." The Social Security judge stated that he gave Dr. Graesser's conclusions only "some weight" because they were "not consisting in both the consultative report and the medical source statement," although he did not elaborate on any discrepancies.

Notably, the administrative record before Aetna does not appear to contain copies of the report of Dr. Leidal (much less the report of Dr. Graesser), nor most of the other medical records discussed in the Social Security Administration's decision.[2]  Moreover, the Social Security Administration's decision makes no mention of either Dr. Koehn or Dr. Compton, the treatment they provided, or their assessments of Mr. Smith's capabilities.  This suggests that the two determinations were necessarily made on starkly-different records, explaining their sharply-different conclusions.  This Court is also reluctant to give meaningful weight to the Social

---

[2]     The Court finds that it was Mr. Smith's obligation under the terms of the insurance policy to provide Aetna with the medical information he believed established his ongoing disability. Thus, the absence of evidence such as Dr. Leidal's report from the record before Aetna is a deficiency that inures to Mr. Smith's detriment.

Security Administration's finding, given its apparent rejection of Dr. Graesser's findings without meaningful explanation.

Accordingly, the Court finds that Aetna's decision was not in violation of ERISA.

### 2. Recovery of overpayments

Separately, the policy provides that "other income" may be credited by Aetna against benefits owed to an employee. Among the things that constitute "other income" are "payments from insurance or other sources . . . which result from the act or omission of any person whose action caused your disability." When an employee receiving benefits receives such "other income," the policy requires Aetna to prorate that income over the period of time for which the payment was made and, if that prorated sum exceeds the benefit amount, recover any overpayments directly or by embargoing future benefit payments.

The record reflects that in or about November 2010, Mr. Smith settled a civil lawsuit against the police officer who assaulted him. Mr. Smith received $ 157,000 through the settlement. On November 24, 2010, Aetna wrote to Mr. Smith's attorney acknowledging the settlement and pointing out that, under the terms of the policy, "payments which result from the act or omission of any person whose action caused your disability" constitute "other income benefits" that operate to reduce or offset benefits that Mr. Smith was entitled to under the policy. Aetna observed that the settlement agreement from the underlying litigation did not apportion the settlement funds between lost wages and other forms of damages, nor did it explain the time period for which the settlement compensated Mr. Smith. Aetna explained that, in such circumstances, its "standard practice is to apportion 50%" of the settlement proceeds to lost wages, and then apply the policy's "other income benefits" terms to that amount. The policy language required any "other income benefits" to be apportioned over their stated duration, or

over Mr. Smith's expected lifetime if no duration was stated.  Thus, Aetna construed 50% of the

$ 157,000 settlement --$ 78,750 – to reflect Mr. Smith's lost wages and then apportioned that

sum over the life of Mr. Smith's claim – a total of 1,475 days by Aetna's calculations – yielding

an offset of approximately $59 per day or $1,601 per month.  After reducing the sums payable to

Mr. Smith by this amount, and applying other credits and minimums, Aetna concluded that it had

overpaid Mr. Smith by $ 23,039.92.  It requested Mr. Smith to remit payment in that amount.

Mr. Smith, through counsel, disputed that the settlement amount reflected any payment

for lost wages.  Among other things, Mr. Smith took the position that the medical conditions

constituting his disability arose prior to the September 2008 altercation,  that the shoulder injury

he suffered during the altercation was not the continuing cause of his inability to return to work,

and that during settlement negotiations with the police officer, he withdrew any demand for

disability-related damages.  Thus, he maintained that no portion of the $ 157,000 settlement

reflected wages Mr. Smith lost due to the injuries he suffered during the altercation and thus, no

portion of that settlement should be used to offset disability benefits owed to Mr. Smith under

the policy.

Aetna wrote back on February 17, 2011, responding that it rejected that assertion as a

"well-after-the-fact summary" of the settlement negotiations.  Nevertheless, Aetna invited Mr.

Smith and his counsel to submit any additional information they had that would establish the fact

of any pre-settlement withdrawal of lost wages damages.  Mr. Smith submitted additional

material, including the deposition testimony of the doctor who surgically repaired his shoulder.

That doctor apparently testified that a person undergoing such surgery would typically be able to

return to work within approximately 7-10 days, but also noted that Mr. Smith's peculiar physical

conditions caused him to heal more slowly from the surgery than expected.

On June 30, 2011, Aetna rejected Mr. Smith's contention that the evidence established that the settlement included compensation for lost wages, and repeated its demand for repayment of $ 23,000.  (Aetna subsequently reduced that amount to $ 18,000 by applying a "legal credit" reflecting the difference.)   The record contains a copy of a check from Mr. Smith's counsel, payable to Aetna, in the amount of $ 18,000, dated Sept. 8, 2011, but nothing in the record suggests that this was the result of any mutual accord between the parties or a concession by Mr. Smith that Aetna's right to reimbursement was no longer contested.

The basis for Mr. Smith's challenge to Aetna's demand for repayment of the benefits is somewhat unclear.  Arguably, Mr. Smith may be bringing a claim under 29 U.S.C. § 1132(a)(1)(B) to "enforce his rights under the terms of the plan" – in this case, enforcing his right not to be held liable for overpayments that are based on arbitrary or capricious interpretations of the plan language by Aetna.

The Court finds that Aetna's interpretation of the settlement agreement, and thus, its ultimate demand for repayment, was arbitrary and capricious.  The Court agrees with Aetna that the terms of the policy permit it to make deductions from benefit payments when an insured receives "other income benefits," including "disability payments" received as part of a litigation settlement.  And the Court further agrees with Aetna that the policy entitles it to seek to recover any overpayments that occur when such reductions exceed the amount of benefits paid.  But Aetna fails to point to any provision of the policy that granted it the authority to unilaterally declare that the otherwise-silent settlement agreement must have included damages for lost wages for Mr. Smith or the authority to apply a "standard practice" of declaring half the settlement funds to reflect such lost wages.

Turning first to the question of whether the record supports a conclusion that the settlement between Mr. Smith and the police officer included compensation for wages lost by Mr. Smith, the settlement agreement between the parties is silent on that point.  At Aetna's request, Mr. Smith has come forward with some limited evidence that the settlement did <u>not</u> include such payments, such as a statement by Mr. Smiths' attorney during settlement negotiations that Mr. Smith was not asserting a claim for disability relating to the altercation and the deposition testimony from Mr. Smith's initial physician indicating that the injuries sustained by Mr. Smith from the altercation would, of themselves, only caused a brief delay in Mr. Smith's return to work.   On the other hand, Aetna points to literally nothing to support its own position that the settlement <u>did</u> include some portion of lost wages compensation.  Aetna does not, for example, offer a copy of the underlying complaint's Prayer for Relief showing a demand for damages for lost wages, or evidence of written or oral settlement demands by Mr. Smith that include such wages.  Aetna thus relies entirely on a presumption that the settlement <u>had</u> to include compensation for lost wages, a presumption that is itself entirely unexplained or unsupported.  Regardless of whether Aetna or Mr. Smith bears the burden of showing the purposes for which the settlement was paid, the record reflects that Mr. Smith has come presented some evidence on this point, and Aetna has presented none.  In such circumstances, Aetna's conclusion that the settlement necessarily included compensation for wage losses is unsupported by the record and is arbitrary and capricious.

Even assuming that the settlement amount reflected some unspecified portion of lost wages, Aetna's decision to simply presume that amount to be 50% of the settlement is also arbitrary.  The policy language itself discloses no such presumption, and although Aetna states in correspondence to Mr. Smith's counsel that such an apportionment is its "standard practice," it

points to nothing in the record to substantiate that assertion.  Moreover, even if this is indeed

Aetna's "standard practice," the presumption is itself arbitrary by definition, as it is an attempt

by Aetna to quantify something that it admits is otherwise impossible to quantify.   It may very

well be difficult for Aetna to quantify the wage payment portion of a lump sum settlement, but

difficulty alone does not justify Aetna instead resorting to an arbitrarily-devised rule of thumb to

demand repayment.

The record does reflect that Mr. Smith ultimately paid Aetna the $ 18,000 it demanded.

In its brief, Aetna states that "Plaintiff eventually agreed to repay Aetna $ 18,000," but the

Court's review of the record contains no clear indication of Mr. Smith or his counsel agreeing to

concede Aetna's entitlement to such funds by operation of the overpayments provision of the

policy.  In the absence of any express concession by Mr. Smith on this point, the Court finds that

Aetna's conclusion that Mr. Smith owed it $ 18,000 in recoverable overpayments was arbitrary

and capricious, and that Mr. Smith is entitled to recover that $ 18,000 payment from Aetna

pursuant to 28 U.S.C. § 1132(a)(1)(B).

## CONCLUSION

For the foregoing reasons, Mr. Smith's Motion for Reconsideration **(# 72)** is **DENIED**.

Aetna's Motion for Ruling Based Upon Administrative Record **(# 69)** is **GRANTED**, and,

having considered the merits of Mr. Smith's claims on the entire record herein, the Court finds

that Aetna is entitled to judgment on Mr. Smith's claim for additional benefits under 29 U.S.C.

§132(a)(1)(B), but that Mr. Smith is entitled to judgment in his favor in the amount of $ 18,000,

reflecting the amount he paid Aetna pursuant to its arbitrary and capricious demand for

reimbursement of overpayments.  Judgment consistent with these findings shall enter

contemporaneously.

Dated this 27th day of March, 2015.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge